UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES BOND | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 12-10787-DPW |
| v. | ) | |
| | ) | |
| MASSACHUSETTS BAY COMMUTER | ) | |
| RAILROAD, LLC | ) | |
| | ) | |
| Defendant | ) | |

MEMORANDUM AND ORDER

November 22, 2013

**I. BACKGROUND**

The plaintiff, James Bond, was an employee of the Massachusetts Bay Commuter Railroad. He was terminated by his employer in October 2011. The MBCR claims that it terminated Mr. Bond because he failed to supervise the repair of a section of commuter rail track properly, leaving it in an unsafe condition. Mr. Bond claims that this reason is a pretext and he, in fact, was singled out for discipline and termination because he was the lone African American manager employed by the MBCR.

*A. Factual Background*

1. **Mr. Bond's Employment with the Massachusetts Bay Commuter Railroad**

The MBCR has operated the commuter rail system in Eastern Massachusetts since taking it over from Amtrak in 2003. Mr. Bond had been employed by Amtrak as a Roadmaster and was hired by the

MBCR in that same role in the MBCR's Track Department, which is part of its Engineering Department.  The Engineering Department is responsible for construction and maintenance of the track, and other facilities of the commuter rail, and Roadmasters are (non-union) managers of work crews performing this construction and maintenance work.  Mr. Bond obtained his position with Amtrak as the result of a settlement of a lawsuit alleging racial discrimination.  From 2007 until 2011 he was the lone African American manager in the MBCR Engineering Department.  (An African American woman holds a clerical and management-type role, but does not manage or supervise any employees.)

2.  Prior Disciplinary Issues

Prior to his termination, Mr. Bond was the subject of disciplinary action by the MBCR on two occasions.

In January 2008, Mr. Bond failed a random alcohol test.  Mr. Bond states in his affidavit that this failure resulted from drinks consumed the prior night and that he was not intoxicated during work hours.  As a result of this incident, Mr. Bond was suspended from work.  Mr. Bond completed a substance abuse program and returned to work in March of 2008.

The other discipline arose as a result of federal regulations that require the MBCR to monitor periodically the safety and operating performance of persons employed by or engaged in railroad operations.  To accomplish this, the MBCR

operates a "Tests and Observations Program."  As a Roadmaster, Mr. Bond performed tests and observations of his crew, which required that he (a) submit a Test and Observation results form; and (b) obtain the signature of employees on the form acknowledging the tests and results.

While reviewing the Test and Observation forms, one of Mr. Bond's supervisors, Paul O'Leary, noticed that the name of one of the signatories was misspelled.  Prompted by this oddity, Mr. O'Leary reviewed all Test and Observation forms submitted by Mr. Bond and other managers over the prior six months.  During this review, Mr. O'Leary discovered other instances in which Mr. Bond apparently signed his supervisees' names to forms.  Mr. Bond admitted to signing employees' signatures on these forms, but contends that doing so was a common practice among Roadmasters and that he was singled out for discipline.  He further states that the tests documented in the Test and Observation forms had actually been performed, so the signatures were not forged with any intent to defraud.  As a result of this violation, Mr. Bond was again suspended from work.  Mr. Bond was also placed on final warning and informed that any further violations would result in his immediate termination.

In addition to these formal disciplinary issues, two disciplinary letters were drafted but not sent to Mr. Bond.  The first related to using a work-issued cell phone for personal

calls.  Rather than sending the letter to Mr. Bond, Mr. Bond's supervisor, Robert Johnson, who appears to have drafted the letter, discussed the issue with him.  Although cell phone abuse was a constant issue at MBCR, Mr. Johnson could not recall discussing it with or issuing a disciplinary issue to any individual other than Mr. Johnson.  The second letter concerned an alleged accident in which a piece of equipment broke and became lodged in the track.  The letter reprimanded Mr. Bond for failing to report the incident to his supervisor promptly.  However this letter was never sent and Mr. Bond testified that the factual basis for the reprimand was inaccurate.

> ### 3.   The October 2, 2011 Incident Resulting in the Termination of Mr. Bond.

Mr. Bond and the MBCR disagree on the series of events that occurred on October 2, 2011 and which led to the termination of Mr. Bond.

On that day, Mr. Bond was overseeing the installation of a "track panel"--a section of track--in order to replace a culvert. When a track panel is re-installed, federal regulations and MBCR's rules require that the rail cross-elevation (the difference in elevation between the two rails of the track) fall below certain maximums.  For Class 1 track, where speeds are restricted to below 10 and 15 mph for commuter and freight trains respectively, the maximum allowable rail cross-elevation is 3 inches over any 62-foot section of track.  For Class 2 track,

where speeds are restricted to below 30 and 25 mph for commuter and freight trains respectively, the maximum allowable rail cross-elevation is 2.25 inches over any 62-foot section of track. These specifications are intended to prevent, among other problems, train derailments.

According to the MBCR, Mr. Bond was required to supervise the re-installation of the track to a condition that was sufficiently safe for trains to operate at Class 2 levels.  At the time that Mr. Bond left the worksite on the afternoon of October 2, however, the track differential exceeded the maximum limits for even Class 1 transit.  Nevertheless, and despite being aware of the cross-elevation problem, Mr. Bond told the head of the Track Department (Herbert Ross) that the track "look[ed] good" for Class 2 speeds.  Later that day, a foreman on another project, Ronnie Allen, found and reported the track cross-elevation problem.  A crew, including Mr. Bond, was assembled to fix the track that evening.

The following day, Mr. Ross reported to Robert Johnson, the Chief Engineering Officer at the MBCR, that there had been a problem with the installation of track the prior evening and that it was sufficiently serious to warrant an investigation.  Mr. Johnson initiated an investigation and the Engineering Department took written statements from the work crew and others present that day.

Written statements taken in that investigation indicated the following sequence of events had occurred. After the track was installed, Andre Richards, the foreman of the crew working under the supervision of Mr. Bond, wanted to use his "level board"[1] to measure the track cross-elevation. Mr. Bond instructed Mr. Richards not to use the level board to measure the cross-elevation. Mr. Bond and Mr. Richards disagreed about whether to use the level board, with Mr. Bond insisting that he would "eye-ball" the cross-track elevation instead. Mr. Bond made the decision that the cross-track elevation was satisfactory and could be "given back." At this point, Mr. Bond told the work crew to pack their tools and leave. He also instructed Mr. Richards to tell Mr. Allen that the track was ready to be returned to service.

Mr. Allen was patrolling and inspecting a larger section of track. During this inspection, he saw that there was too large a cross-elevation differential between the tracks in the area worked on by Mr. Bond and his crew. He measured the cross-level elevation at 4 3/8 inches, well above the allowable maximum. He called Mr. Bond and assembled a work crew to fix the cross-elevation that evening. The problem was fixed promptly and the track was returned to service for the next morning on-schedule.

---

[1] A "level-board" is an instrument used to measure the cross-level elevation of tracks. Use of a level-board is the only reliable means of determining cross-level elevation.

Mr. Bond recounts the events differently.  When he arrived at the worksite on October 2, 2011, his foreman, Mr. Richards had not brought a level board--he reported that his had been stolen--but found one at the worksite.  Mr. Bond had concerns about whether the level board functioned properly and whether it would provide an accurate reading.  After the track was installed--with some difficulty because of equipment malfunctions--Mr. Richards tried to measure the cross-elevation differential using the found level-board.  Mr. Bond instructed him not to do so, because of his concerns about accuracy of the level-board.  Instead, he told Mr. Richards to wait for Mr. Allen to check the tracks with his (functioning) level-board.  Although he said the track "looks good," he never told anyone that it could be returned to service.  Rather, he told Mr. Richards that the track would be put back into service only pending the results of Mr. Allen's inspection.  Mr. Allen's deposition testimony and his written statement confirm that he intended to inspect the full section of track that had been taken out of service before it would be put in-service.  Although Mr. Richards repeatedly tried to use the level board that he found, Mr. Bond insisted that he await Mr. Allen's inspection.  At this point, Mr. Bond received a call from home telling him that there had been a minor kitchen fire.  Mr. Bond went home to deal with that issue, leaving Mr. Richards with instructions to await Mr. Allen's inspection.

-7-

Only later that afternoon did Mr. Bond receive a call from Mr. Allen in which Mr. Allen said that there was an issue with the cross-elevation differential.  Mr. Bond called his crew together, returned to the worksite, and fixed the problem.

Based upon the results of the investigation and crediting written statements from members of the work crew over Mr. Bond's account, Mr. Johnson made the decision to terminate Mr. Bond and informed Mr. Bond on October 12, 2011.  The MBCR replaced Mr. Bond with Ronnie Allen, who is Caucasian.

### 4.   Comparator Evidence

Mr. Bond contends that his treatment and discipline was harsher than that doled out to comparably situated white employees.

Mr. Bond compared his disciplinary actions to two unionized employees--referred to as Union Employee #1 and Union Employee #2.  Union Employee #1 was a foreman who was charged with dishonesty, misappropriation of pay, and other similar derelictions of his duties.  An investigation was undertaken pursuant to the grievance process set out in the collective bargaining agreement.  After a hearing, Union Employee #1 was terminated, but subsequently, following an appeal to a labor arbitration panel, the employee was reinstated.

Union Employee #2 was charged with falsifying a report regarding a "close call" with a truck crossing tracks.  After an

-8-

investigation, Union Employee #2 was terminated from his position.  However, as with Union Employee #1, Union Employee #2 successfully appealed his termination to an arbitration panel and was reinstated.

In addition to the two union employees, Mr. Bond also testified in his deposition regarding a series of incidents involving other managers.  He describes an incident in which Joe Rodriguez performed work which had to be subsequently repaired by a surface crew, an incident in which Herbert Ross laid down tracks in warm temperatures causing "sun kinks," an incident in which Mr. Ross backed a dump-truck into a lamp-post damaging the truck, a third incident involving Mr. Ross in which he left a piece of equipment on the tracks where it was struck by a train, an incident in which an employee supervised by Patty Mallon was killed during a snow-storm, and an incident involving a derailment on a segment of track supervised by Jim Ferrero.  None of these individuals were terminated as a result of these incidents.  Mr. Bond, however, does not appear to have first hand knowledge of these incidents, or of any investigations or disciplinary action resulting from the incidents.  No other competent evidence providing further information about these events appears in the record.

More broadly, Mr. Johnson's affidavit indicates that he is unaware of any incidents during his tenure (2004 to the present)

in which a manager in the Engineering Department who was on his final warning following two incidents committed a third violation of safety standards.  In addition, Mr. Johnson states that he is unaware of any incident in which any manager left a track project in a dangerous condition similar to the condition in which Mr. Bond left the track panel installation project on October 2, 2011.

In addition to the incidents above, Mr. Bond contends that on October 2, 2011 and more generally, he was provided equipment that was inferior to that provided to other work crews headed by white Roadmasters.  The MBCR responds that the equipment provided was sufficient to perform the assigned tasks and that such complaints are near-universal among Roadmasters.  In addition, the "big tamper"--the equipment preferred by Mr. Bond for the October 2, 2011 job--was in use that day on repairs being performed on a larger piece of track.  Finally, it points out that the equipment provided to Mr. Bond's crew was ultimately used the evening of October 2, 2011 to put the tracks in suitable condition for service the next morning.

### B. Procedural Background

Mr. Bond initially filed a complaint in this court on May 1, 2012; he filed an amended version on June 27, 2012.  The amended complaint asserted claims of racial discrimination in violation of 42 U.S.C. § 1981 and Massachusetts General Law Chapter 151B

and named as defendants the MBCR, and Dana Rodrick, Herbert Ross, John Mitchell, Patricia Maloney, and Robert Johnson.

The individual defendants filed a motion to dismiss the claims against them, which I granted on October 1, 2012.  That same day I set a schedule for the completion of fact and expert discovery, and for the filing of dispositive motions.

Following discovery, the MBCR filed a motion for summary judgment.  Also pending before me is the MBCR's motion to strike the plaintiff's additional statement of undisputed facts and portions of plaintiff's response to the MBCR's statement of undisputed facts.[2]

## II. STANDARD OF REVIEW

Fed. R. Civ. P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).  The question

---

[2] I will not grant defendant's motion to strike.  I do not view plaintiff's submission of an additional statement of facts as inappropriate or inconsistent with Local Rule 56.1, which provides that "[a] party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1.  However, to the extent that facts are unsupported by the record evidence presented to me or appear to be based upon hearsay or other inadmissible evidence, I have not relied upon them in my description of the relevant facts set forth above.

is whether, viewing the facts in the light most favorable to the nonmoving party, there is a "genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *Casas Office Machines, Inc.* v. *Mita Copystar Am., Inc.*, 42 F.3d 668, 684 (1st Cir. 1994).

In the context of discrimination cases, summary judgment is a "disfavored remedy" because "the ultimate issue of discriminatory intent is a factual question" and the "question of the defendants' state of mind is elusive and rarely is established by other than circumstantial evidence." *Blare* v. *Husky Injection Molding Systems Boston, Inc.*, 646 N.E.2d 111, 114 (Mass. 1995).  *See also Santiago-Ramos* v. *Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000) ("[C]ourts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent.").  Nevertheless, summary judgment is appropriate where "the plaintiff's evidence of intent, motive, or state of mind is insufficient to support a judgment in plaintiff's favor." *Blare*, 646 N.E.2d at 114.  *See also Feliciano De La Cruz* v. *El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000) ("Even in employment discrimination cases where . . . motive or intent are at issue, [summary judgment is compelled] if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.")

### III. ANALYSIS

**A.  *The Legal Framework***

Where, as here, there is no direct evidence of race-based discrimination, the case is evaluated according to the standard articulated by the United States Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-805 (1973).[3]  Under that standard, the initial burden is placed upon the plaintiff to set forth a *prima facie* case by showing he (1) is a member of a protected class; (2) performed his job satisfactorily; (3) experienced an adverse employment action; and (4) was replaced by a person with roughly equivalent job qualifications who is not a member of his protected class.  See *Ayala-Gerena* v. *Bristol Myers-Squibb Co.*, 95 F.3d 86, 95 (1st Cir. 1996).

A plaintiff's successful production of evidence sufficient to make out a *prima facie* case creates a presumption of discrimination.  *St. Mary's Center* v. *Hicks*, 509 U.S. 502, 506 (1993).  Upon such a showing, the burden then shifts to the employer to show a legitimate, non-discriminatory reason for the plaintiff's termination.  *Id.*

---

[3] Although developed in the context of Title VII of the Civil Rights act, the *McDonnell Douglas* principles are applicable to claims of intentional discrimination under 42 U.S.C. § 1981, *T&S Associates, Inc.* v. *Crenson*, 666 F.2d 722, 724 (1st Cir. 1981), and discrimination claims brought under Mass. Gen. Laws c. 151B, *Wheelock College* v. *Massachusetts Commission Against Discrimination*, 33 N.E.2d 309, 314-15 (Mass. 1976).

If the employer supplies such a reason, the plaintiff is required to show by a preponderance of the evidence that the employer's proffered reason is pretextual and that the actual reason for the adverse employment decision is discrimination. *Johnson* v. *Univ. of Puerto Rico*, 714 F.3d 48, 54 (1st Cir. 2013). The plaintiff may meet this burden by showing that the employer's proffered reason for the challenged employment action was pretextual, from which the factfinder in turn may find the alleged discriminatory animus. *Gonzales* v. *El Dia*, *Inc.*, 304 F.3d 63, 69 (1st Cir. 2002); *Lipchitz* v. *Raytheon Co.*, 751 N.E.2d 360, 368 (Mass. 2001) ("[I]f if the fact finder is persuaded that one or more of the employer's reasons is false, it may (but need not) infer that the employer is covering up a discriminatory intent, motive or state of mind.").

### B.  *Plaintiff's* **Prima Facie** *Case.*

As an African American who was terminated from his job and replaced by a Caucasian, the plaintiff easily satisfies the first, third, and fourth prongs of the *prima facie* analysis.

The defendant contends, however, that the two prior suspensions received by Mr. Bond and the track panel incident demonstrate that he was not adequately performing his job responsibilities.  Mr. Bond contends that these incidents are pretextual and he was singled-out for punishment on account of his race.

The burden of establishing a *prima facie* case is not onerous. *Brennan* v. *GTE Gov. Sys. Corp.*, 150 F.3d 21, 26 (1st Cir. 1998). Here, Mr. Bond was employed for more than a decade as a Roadmaster for the MBCR and Amtrak. During that time he was not cited for any direct violations of federal regulations nor did his supervisors identify any persistent issues with the quality of his work, apart from the discrete issues identified above. This history suggests that Mr. Bond was qualified and able to perform his job successfully. *See Briddell* v. *Saint-Gobain Abrasives, Inc.*, 2007 WL 1101158, *7 (D. Mass. March 30, 2007) (decade long work-history and satisfactory reviews were sufficient to establish *prima facie* case despite claimed rule violations); *Loeb* v. *Textron, Inc.*, 600 F.2d 1003, 1013 n. 10 (1st Cir. 1979) ("the fact that he was hired initially indicates that he had the basic qualifications for the job").

## C.   *The Reason for the Termination of Mr. Bond.*

There is no serious dispute that the MBCR has articulated a legitimate reason for Mr. Bond's termination. He was suspended on two occasions from his job for violations of rules--the second suspension accompanied by a final warning that any further violations would be grounds for his termination. After receiving that warning, Mr. Bond was involved in the October 2, 2011 incident in which he allegedly left a portion of the track in an unsafe condition and in violation of federal regulations.

This shifts the burden back onto Mr. Bond to demonstrate that this articulated reason was in fact a pretext for discriminatory motive.  Mr. Bond attempts to accomplish this in multiple ways.

First, Mr. Bond attempts to undermine the credibility of the October 2, 2011 investigation.  Mr. Bond principally relies on the facts that (i) he never actually instructed anyone that the tracks could be returned to service--which was to be done by Mr. Allen; and (ii) the tracks were successfully repaired and placed into service on-time for the commute the following day.

The MBCR responds that this is beside the point.  It was Mr. Bond's job to repair the track and ensure that it was returned to safe operating condition.  Rather than accomplishing that task, he refused to use the available level-board to ensure that the track condition met the applicable safety standards, reported that the track "look[ed] good" for 30 MPH service, and ultimately left the track in unsafe operating condition.  The fact that Mr. Allen subsequently inspected the track did not alter or excuse Mr. Bond's dereliction of his duty.

In assessing the credibility of this investigation, the ultimate issue for the factfinder is "the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible."  *Caesar* v. *Shinseki*, 887 F. Supp. 2d 289, 299 (D. Mass. 2012) (internal citations and quotation marks

omitted).  Mr. Bond has a different view from Mr. Johnson regarding the events of October 2, 2011 and the severity of any problems that might have occurred that day.  The role of this court is not to arbitrate whether Mr. Bond or Mr. Johnson's interpretation is more accurate.  *Mesnick* v. *General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing the merits-or even the rationality-of employers' nondiscriminatory business decisions.") (citations omitted).  Instead, my role is to determine whether there exist facts indicating that the investigation was a pretext for discriminatory conduct.  Here, Mr. Johnson's factual determinations are supported by credible statements from a number of witnesses.  Based upon his factual determinations, his decision to terminate Mr. Bond does not appear unreasonable in light of the prior disciplinary actions, including a warning that further incidents would lead to termination.  Mr. Bond obviously disagrees with these decisions, but disagreement with the outcome of the investigation and the weighing of the severity of the incident, without more, fails to demonstrate pretext.

Second, Mr. Bond seeks to demonstrate that Caucasian peers were treated more leniently while he was singled out for harsh disciplinary punishments.  "The most probative means of establishing that the plaintiff's termination was a pretext for racial discrimination is to demonstrate that similarly situated

white employees were treated differently." *Matthews* v. *Ocean Spray Cranberries, Inc.*, 686 N.E.2d 1303, 1309 (Mass. 1997). Although such comparator evidence need not present a perfect match, "[a] claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in all material respects." *Perkins* v. *Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996).

The evidence presented regarding the two unionized employees does not satisfy this standard for two reasons. First, such employees are not similarly situated--rather than acting as managers, like Mr. Bond, they were foremen of work crews. These employees thus did not share the same supervisory responsibilities as Mr. Bond. Second, and more importantly, Mr. Bond cannot show that the unionized workers were treated differently by the MBCR. In each case, the MBCR terminated the union employees--the same treatment given to Mr. Bond. The fact that they were reinstated on the basis of an arbitration process provided for under their collective bargaining agreement does not change the fact that the MBCR made the decision to terminate them.

In addition to the union workers, Mr. Bond has testified in his deposition to incidents involving other managers--Herbert Ross, Joe Rodriguez and Patty Mallon--who were not fired. This evidence, however, is not sufficiently substantial and well-

developed to demonstrate that these managers were similarly
situated and treated differently.  First, it appears that Mr.
Bond does not have direct personal knowledge of these incidents
or any follow-up investigations or discipline which resulted from
them.  This alone makes these examples insufficient as comparator
evidence.  *See Vega* v. *Kodak Caribbean, Ltd.*, 3 F.3d 476, 479
(1st Cir. 1993) ("the material creating the factual dispute must
herald the existence of 'definite, competent evidence' fortifying
the plaintiff's version of the truth.").  Second, without more
detailed information about these incidents--which Mr. Bond
appears unable to provide--I cannot conclude that these events
were similar in ways that are relevant, including the degree of
fault (if any), the severity of the incidents, or the conclusions
reached from any investigation.  Finally, without information
about the prior disciplinary records of any of these individuals,
I cannot conclude that they were similarly situated to Mr. Bond,
who had previously been suspended on two occasions.  Thus it is
impossible to determine that any of these individuals was
situated similarly but received more lenient treatment for
similar violations.

Mr. Bond also questions the viability of the two predicate
offenses which led to his placement on "final warning" status
contending that he was singled out for unfair punishment.  For
the first offense, involving failing an alcohol test, there

cannot be any serious argument that this demonstrates race-based animus or was a fabricated pretext.  Mr. Bond failed a presumptively objective alcohol test and does not dispute that. And he presents no evidence that other managers failed alcohol tests but were treated more leniently.  With regard to the second incident, involving falsely signing Testing and Observation forms, Mr. Bond testifies that he had observed others--Caucasian managers--doing the same thing.  Here again, however, my task is not to determine whether others committed similar offenses. Rather, it is to examine the information available to the relevant decisionmaker.  In this instance, the investigation of the Testing and Observation forms was performed by Paul O'Leary. Mr. O'Leary testified in his affidavit that (i) he became aware of that a form submitted by Mr. Bond had a misspelled signature; (ii) troubled by this, he investigated and reviewed other forms-- submitted by Mr. Bond as well as other individuals--and found similar discrepancies on other forms submitted by Mr. Bond; and (iii) he is unaware of any other Roadmasters signing forms on other employees' behalf.  Mr. O'Leary reported this information to Mr. Johnson who made the decision to discipline Mr. Bond.  Mr. Bond has produced no evidence which contradicts these events or suggests that either Mr. O'Leary or Mr. Johnson knew of and ignored similar conduct by white employees.

Mr. Bond clearly disagrees with the grounds for his termination and believes that he was treated unfairly.  What he has failed to do, however, is produce evidence showing that the legitimate reasons for his termination articulated by the MBCR were pretextual and a cover for illegitimate motive.

For this reason, I will grant summary judgment in favor of the defendant.

## IV.   CONCLUSION

For the reasons set forth more fully above, the defendant's summary judgment motion (Docket No. 31) is GRANTED, and the Clerk is directed to enter judgment for the defendant.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE